FILED & ENTERED

NOV 17 2009

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY harraway DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. SV 03-15884-KT |
| SHAHRIAR DARGAHI & NAZILA ADELI-NADJAFI, | Adv. No. SV 06-01228-KT |
| | Chapter 11 |
| Debtors. | **MEMORANDUM OF DECISION ON TRIAL** |
| SHAHRIAR DARGAHI & NAZILA ADELI-NADJAFI, | |
| Plaintiffs, | Date: February 27, 2009<br>Time: 10:00 a.m.<br>Location: Courtroom 301 |
| vs. | |
| KEST INVESTMENT COMPANY, a California General Partnership; ANAHEIM CAPITAL, LLC., | |
| Defendants. | |

Shahriar Dargahi and his wife Nazila Adeli-Nadjaifi are debtors in a chapter 11 case filed on July 14, 2003 ("Debtors" or the "Dargahis"). The Debtors commenced this adversary proceeding against defendants Kest Investment Company and Anaheim Capital, LLC (collectively, "Kest") on July 14, 2006. Although the Debtors have proposed a chapter 11 plan, the confirmation process cannot go forward until the disputes between the Debtors and Kest are determined. (See Interim Memorandum On Confirmation of Debtors' Chapter 11 Plan, Docket #222, entered in the main case.)

The dispute between the Debtors and Kest arises out of the Debtors' purchase in 1997 of real property in Long Beach, California, improved by a gasoline station (the "Property"). The purchase included seller financing by Kest. The Debtors executed a promissory note to Kest in the amount of $400,000 (the "Note"), payment of which was secured by a lien on the Property.

The Debtors and Kest have been locked in a death grip of litigation since the commencement of this case. This litigation has included trials on relief from stay[1], confirmation, and the complaint which is the subject of the instant memorandum. The complaint at issue was first set for trial in January 2008. It was continued, at the request of the parties, for various reasons until October 2008. Once begun, the trial did not conclude until late in February 2009 because of the parties' scheduling difficulties. The parties requested post-trial briefing which concluded August 2009. This adversary matter is now before the court for decision.

<u>Issues Tried in this Adversary</u>

Since the beginning of the trial, the parties have disagreed on what issues have been properly raised for determination in this adversary. The post-trial briefs continue this debate. It is this court's view, expressed to the parties more than once, that the issues are limited to those fairly raised in the complaint or otherwise tried by consent of the parties.

<u>The Complaint</u>

The complaint bears the title "Complaint to Determine Secured Status." No specific causes of action are delineated. However, Debtors' allege that they are entitled to relief against Kest with regard to five situations in their dealings with one another:
1. The Debtors allege that Kest concealed certain facts about a state remediation program that the Debtors believed would help pay for costs related to leaking fuel tanks;

---

[1] Relief from stay was granted by Bankruptcy Judge Arthur Greenwald who was assigned to this case prior to his retirement. The matter was reversed on appeal and remanded back to the bankruptcy court for further proceedings which concluded with an order for adequate protection payments of $5,000 a month.

2

2. The Debtors allege that Kest has overcharged them on the Note by continuing to assert a higher rate of interest negotiated in a 1999 modification even though the right to that higher rate expired in October 2001;
3. The Debtors allege that Kest refused to follow through with an agreement made in March 2003 which called for $100,000 on the loan in exchange for payoff or paydown of the Note;
4. The Debtors allege that after they arranged new financing and stopped regular payments to Kest in reliance on the March 2003 agreement, Kest refused to provide a beneficiary's demand to the escrow company in any amount and the financing fell apart; and
5. The Debtors allege that Kest then sought to foreclose on the property, thereby forcing the Debtors to file bankruptcy.

The prayer in the Complaint seeks the following relief against Kest:

1. the right to setoff of $100,000 based on an accord and satisfaction or novation;
2. the right to setoff equal to damages suffered by the Debtors as a result of Kest's failure to place a pay-off demand or beneficiary statement in a refinance escrow;
3. removal of any claim for legal fees claimed by Kest arising out of their unsuccessful prosecution of relief from stay;
4. the right to setoff equal to an estimated $25,000 in damages for Kest's failure to disclose facts regarding the status of Kest's participation in an environmental contamination remediation program of the California State Water Control Resources Board;
5. the determination of Kest's claim under §506; and
6. costs and fees and such other relief as may be proper.

In December 2006, Kest filed a motion for summary judgment which was heard and denied in February 2007. On February 8, 2007, the court issued a written memorandum in connection with the denial of the summary judgment motion which answered, clarified, or put off to trial numerous questions about the legal and factual issues raised by the complaint with regard to the state remediation program and whether an agreement was reached in March 2003.

### Discussion

The heart of this matter is to determine the amount of Kest's secured claim in this bankruptcy case. The Debtors made three specific challenges in the Complaint. Except where otherwise identified, the facts set forth in the following discussion are either undisputed or constitute findings by this court based on the evidence presented.

3

### The Right to Setoff Based on a Novation or Accord and Satisfaction

The Debtors assert that Mr. Dargahi reached an agreement with Mr. Kest in January 2003 to discount the Note by $100,000 and pay the balance with a combination of cash and a smaller note secured by single family residence ("San Miguel") owned by Mr. Dargahi. Kest asserts that the negotiations between the parties did not result in an agreement. After considering the testimony of the witnesses and the few documents memorializing their contact on this issue, the court concludes that no agreement was reached.

The Debtors point to an amortization schedule faxed to them by Kest which shows four entries for April 20, 2003 corresponding to the points in play. The first two are debits for title and recording which presumably relate to perfecting an interest in San Miguel. The next two entries state "Forgive $100,000" and "Cash Pmt $225,000."

There is no dispute that Kest did not credit any loan forgiveness of $100,000 and that the Dargahis did not tender a cash payment of $225,000. Instead, the Debtors argue that this amortization schedule is proof of acceptance of these terms. (Ex. 21) Kest, on the other hand, argues that the amortization was sent to the Dargahis at their request and was meant to demonstrate that there would be $78,939.17 left unpaid under the proposal. Testimony differed as to whether the non-cash portion of the Dargahis' offer was for a $50,000 or $75,000 lien on other property. Kest's controller, Renee Davis, testified that the line item on Exhibit 21 for "title" was the cost of title insurance if there was a lien for $50,000.

On balance, considering the contemporaneous notes taken by Ms. Davis as well as the testimony of Mr. and Mrs. Dargahi, Ms. Davis and Mr. Kest, the court finds that the negotiations did not result in an agreement. Therefore, no set off of $100,000 for failure to abide by an agreement to discount the Note is warranted.

### Damages from Kest's Failure to Place a Payoff Demand in Escrow

The parties' dispute over whether an agreement was reached to discount the Note is related to this next dispute, i.e., that Kest refused to put a demand into escrow and, as a result, the Dargahis lost a loan commitment which was in an amount sufficient to pay off Kest in full, with or without a discount. Kest asserts that the Dargahis have not shown that they had a loan commitment. The court disagrees. There is sufficient written evidence in the record in addition to the testimony of the Dargahis to conclude that a loan commitment was made. The documents include a mortgage loan disclosure statement, an executed promissory note, and an executed deed of trust. (Ex.17, 18, 19)

The Dargahis never offered to pay Kest in full during the vigorous, adversarial negotiations for a reduced payoff. Kest received a written request from the Dargahis' authorized agent for a payoff demand statement during the course of the negotiations. (Ex. 20) Athough Ms. Davis testified that the request did not include a form "Beneficiary Demand Statement" said to be enclosed, there is nothing equivocal about the request for the demand statement.

Ms. Davis testified that Mr. Dargahi also telephoned making an oral demand for Kest to send its payoff statement to the loan broker. She further testified that when she told Mr. Dargahi that the demand would be for payment in full, Mr. Dargahi replied, "Why bother." The parties agree that by the end of March, Mr. Kest refused to speak further with the Dargahis on the subject.

A secured lender ignores a request for a payoff demand statement at its peril. California Civil Code §2943(b)(1) states that a beneficiary has 21 days of the receipt of a written demand from an entitled person to deliver their payoff demand statement to the person demanding it. Statutory exceptions to this obligation do not apply in this case. Section 2943(e)(1) requires the beneficiary to treat any request for a statement to be a request for a payoff demand statement. Section 2943(c)(4) provides that a willful failure to prepare and deliver the statement results in liability for "*all damages which the entitled person may sustain by reason of the refusal and, whether or not actual damages are sustained, he or she shall forfeit to the entitled person the sum of three hundred dollars ($300).*" It is undisputed that Kest did not respond.

In its defense, Kest argues that they had no reason to believe that the Dargahis had a loan sufficient to pay them in full, that Mr. Dargahi led them to believe that Kest would be paid only if the loan was discounted, and, when told that would not happen, Mr. Dargahi told Kest not to bother responding.

The court notes that the loan broker's demand states that "your loan will be paid in full at the close of escrow." Section 2943 does not give a loan beneficiary discretion to refuse to give a payoff demand if the entitled person does not sufficiently prove both ability and desire to pay off the subject loan. Kest confused its anger over the Dargahis' demands for accommodation with its statutory duty to respond. By declining to respond as they were required to do, Kest frustrated and ultimately foreclosed the Dargahis' ability to concede and pay off Kest in full.

The court finds that Kest willfully failed to prepare and deliver a beneficiary's demand statement in violation of Section 2943. At a minimum, Kest is liable to the Dargahis for the minimum statutory penalty of $300.00.

The question of other damages resulting from Kest's failure to submit a beneficiary's demand statement is less clear. The title report on the Property dated March 19, 2003 (Ex. UU) indicates that the minimum encumbrances on the

5

Property were close to the amount of the loan commitment of $646,000. These encumbrances included tax liens and a second trust deed obligation of approximately $114,000 which remained unpaid in July 2003 when the Dargahis declared bankruptcy.

If Kest's encumbrance is measured by the amortization schedule done by the Dargahis' expert (Ex 29) which shows the balance on the Note in February 2003 to be $377,980.50, then the minimum amount required to clear title would be $623,645. The Dargahis' expert's amortization schedule includes no default interest or costs and advances. Kest's proof of claim shows a lower principal balance as of the date of bankruptcy three and a half months later ($359,653.43) but also includes more than $86,000 in arrearages, costs, and advances.

The evidence provided by the parties as outlined above shows that without a discount from Kest, the Dargahis might have been able to close their refinance escrow in March 2003, but that outcome is by no means certain given the amount of the encumbrances to be cleared and the almost certain disputes with Kest over the amount due. Kest's proof of claim asserts over $60,000 in arrearages, let alone costs and advances. If one subtracts out the minimum interest payment (9% simple interest on the lowest suggested principal balance) due from March to the date of bankruptcy, Kest's demand would have exceeded the funds available if all other liens were also paid.

The Dargahis blame Kest for their bankruptcy filing and claim unspecified emotional damages relating thereto. The bankruptcy filing in July 2003 was filed to stop Kest's foreclosure proceedings and raise the Dargahis' challenges to Kest's claim. However, given the uncertainties outlined above and the substantial amount of priority and unsecured claims in the case ($238,483 and $277,618, respectively), the Dargahis have not shown that their bankruptcy or any emotional trauma connected with the bankruptcy is the result of Kest's failure to submit a beneficiary's demand.

In light of the foregoing, the court finds that Kest is not liable to the Dargahis for damages in excess of the statutory minimum.

<u>Intentional Interference With Contractual Relations</u>

To the extent that the Dargahis are pursuing remedies against Kest for intentional interference with contractual relations relating to the payoff demand, the court finds both that the Dargahis did not plead such a cause of action and that such a cause of action was not tried by consent or waiver. The Dargahis' reference to the court's remarks in court on October 15, 2008, do not state otherwise. The issue raised in the pleadings and on for trial was whether Kest is liable for damages under Section 2943 for failure to submit a beneficiary's demand statement and, if so, in what amount. In addition, the court finds that the

6

Dargahis have not proved the elements of a cause of action for intentional inference with contractual relations, particularly the requirement for wrongful conduct separate from the failure to put in a payoff demand.

### Kest's Failure to Name the Debtors as Co-Payees On Environmental Cleanup Claim

The contract for sale of the Property is embodied in the written escrow instructions (the "Escrow Instructions"). (Ex. 1)  Paragraph 26 of the Escrow Instructions states the following:

> "*Seller will name the buyer as co-payee regarding the reimbursement fund from State Water Resources program.  Buyer and selelr [sic] hereby acknowledge and agree that there is no discount from the selling price because of the existing contamination at the subject property.  The parties further agree that this is not a contingency to this escrow.*"

Prior to the sale of the Property in August 1997, Kest had an application pending before the State Water Resources Control Board ("SWRCB") seeking to qualify for reimbursement from the state's Underground Storage Tank Cleanup Fund of approved expenses related to remediation and clean up of a gasoline leak on the Property discovered in April 1985.  This application or claim is sometimes identified as Claim # 0938 and will be referred to hereinafter as the "Claim."

### Status of the Claim When the Property Was Purchased

Although the Debtors have alleged that the Claim had been rejected by the SWRCB at the time of the sale and that Kest failed to disclose this information or actively misrepresented it, Mr. Dargahi's actual testimony is fairly consistent that Kest made no direct representations about the status of the First Claim.  No evidence of written representations from Kest about the status of the Claim was introduced.  At one point, Mr. Dargahi testified that all of his purchase negotiations were with Wolf Meisel who he thought to be an owner of the gasoline station along with Kest.  Mr. Dargahi testified that Mr. Meisel represented that there was a Claim and that it was in good standing.  Mr. Dargahi also testified that he did some investigation with the SWRCB before the sale closed and did not see any reason to believe that there was no Claim or that the Claim had been rejected.

Even if Mr. Meisel or someone else on behalf of Kest did not affirmatively represent that the Claim was in good standing, the existence of the provision in the Escrow Instructions for naming the Dargahis as co-payees presupposes that the Claim is still viable and that naming the Dargahis would not be a frivolous act.

7

Mr. Dargahi also testified that his investigation with the SWRCB before the sale closed as well as soon thereafter did not reveal the earlier August 8, 1996 letter to Marmorish Oil Company, Inc., an entity in which Kest was an investor ("Marmorish").  In this letter, the SWRCB stated that the Claim was not eligible for reimbursement because Marmorish had failed to remain in compliance with certain requirements of the program.  Marmorish was also informed that they had 60 days to appeal before the decision would become final.  (Ex. 10)  There is no reason to believe that Kest did not know about this notification of the status of the Claim.

Even so, a subsequent communication from the SWRCB to Marmorish in December 1997, after the sale closed, demonstrates that the decision could be reviewed, reconsidered or appealed.  (Exs. 13, 14).  Notification that the rejection of the Claim was final was sent to Marmorish in March 1998.  (Ex. 15).  Kest's response was to give the SWRCB Mr. Dargahi's address.  Kest made no other effort to communicate any of this information to Mr. Dargahi even though Kest says it was in frequent contact with Mr. Dargahi over payment of the note.

### Failure to Name the Dargahis as Co-Payees

There is no doubt that Kest failed to name the Dargahis as co-payees on the Claim and that this failure was a breach of their agreement with them.  The dispute now is about the consequences of that breach.  Was the failure excused?  Were the Dargahis damaged as a result of this breach?  Are the Dargahis entitled to any remedies at this point?

### Kest's Arguments in Defense

Preliminarily, Kest argues that the Dargahis have not shown that Kest failed to name the Dargahis as co-payees on the Claim.  Kest's assertion that the Dargahis must prove a negative is misguided.  Kest is the party who knows whether the obligation was fulfilled.  Kest has offered a lot of reasons why they should not be found at fault on this issue but they have never asserted that they did as they promised they would do.  Such an argument renders the initial promise meaningless, disingenuous, and in bad faith.  The court rejects both of these arguments.

Kest makes several other arguments about why Kest should not be held accountable for their undisputed failure to add the Dargahis as co-payees on the Claim.  First, Kest intimates that any obligation to inform the Dargahis of the status of the Claim was excused by the Dargahis failure to ask about the status of the Claim or their status as a co-payee on the Claim.  In effect, then, they say that it is Mr. Dargahi's fault that Kest ignored its promise until fulfillment was rendered meaningless and resurrection of any rights in the claim by the Dargahis was no longer capable of remediation.

8

Second, they point out that there was no time frame specified within which to make good on this promise. This argument is tantamount to saying that "never is as good as ever" because time is infinite. The court rejects these two arguments.

Third, Kest argues, based on Exhibit E, that Kest's failure to add the Dargahis as co-payees to their Claim with the SWRCB is excused because no harm resulted from such failure. Kest asserts that Exhibit E shows there was no contamination from the 1985 leak that needed remediation and, therefore, no reimbursement would have been forthcoming. The court disagrees with Kest's reading of Exhibit E.

Exhibit E is a letter dated March 5, 2005 from an environmental consulting firm ("ES") employed by Mr. Dargahi that was sent to the SWRCB about contaminant releases on the Property. This letter recites the previous release in April 1985 which is the subject of the Claim and notes that soil samples taken in April 1985 showed contamination by total petroleum hydrocarbons (TPSs) associated with two 10,000 gallon underground storage tanks. These tanks failed a tank-tightness test when tested later that year in September 1985. The tanks were then repaired. They passed a tank-tightness test that same month. The tanks passed another tightness test in August 1997 under Mr. Dargahi's ownership.

The tanks were removed by Mr. Dargahi in November 1998. New soil samples taken at this time showed that one of the locations sampled in 1985 (Boring B-1) no longer contained detectable levels of TPH. However, another location sampled in 1985 (Boring B-4) now showed contamination substantially higher that previously measured. From this information, the environmental consulting firm concluded that there had been a new release since the two successful tank-tightness tests in 1985 and 1997.

Notably, nowhere does the environmental firm opine that the contamination initially found from Boring B-4 in 1985 was mistaken or had somehow corrected itself. The tanks may have been repaired in September 1985, but there is no record that the contamination that preceded the repairs had been mitigated. One could infer that Boring B-1, taken in 1985, was in error since the location showed no detectable levels of contamination in 1998. However, the expert did not do so and neither should the court. Certainly, Kest had no such knowledge or reason to believe that they were excused from performing on their promise to the Dargahis based on miscalculations done in 1985.

Fourth, Kest asserts that Mr. Dargahi admitted that Kest had no ongoing obligations with respect to the Claim on the 1985 leak once closing occurred. This assertion misstates the import of Mr. Dargahi's testimony in the excerpt

9

identified.  Mr. Dargahi agreed that Kest had no continuing responsibilities with regard to the Claim <u>other than being named as co-payee</u>.

### No Fraudulent Misrepresentation

The Dargahis insist that Kest's failure to tell them about the status of the Claim is a fraudulent misrepresentation.  After considering all of the evidence, the court concludes otherwise.

Mr. Dargahi testified that he paid Kest what he calls the "full price" for the Property because he was convinced that he would receive reimbursements from the state under the Claim of around $100,000.  However, the evidence is not sufficient to support a conclusion that Mr. Meisel on behalf of Kest or Kest by its silence intended to deceive Mr. Dargahi about the status of the Claim or any potential reimbursements related to it.  The evidence is not sufficient to support a conclusion that Meisel or Kest intended that Mr. Dargahi rely on any information or lack of information from them about the Claim.  Indeed, the Claim was still alive when the sale was closed.  Instead, Kest was indifferent to its responsibility to make the Dargahi's a part of the claim process on the Claim.

More importantly, Mr. Dargahi has been unable to demonstrate justifiable reliance on what to him was so important a point because he testified that he made independent inquiries about the claim files to the SWRCB both before and after the sale closed.  In addition, the Escrow Instructions, at ¶10, specifically state:  "*The parties hereto agree that no representations have been made by either party, other than those specifically set forth in this agreement and this [sic] escrow instructions and this is the final agreement between the parties, superseding all prior agreement whatsoever.*"

### Only Nominal Damages Proved

The Dargahis did not prove more than nominal damages resulting from Kest's failure to name them as co-payees under the Claim.  The Escrow Instructions make it clear that the parties are bound only by those representations contained in or inferred from the written agreement (¶10) and that the co-payee provision is not a contingency to the escrow (¶26).

Even if a right to reimbursements from the state is an appropriate contractual inference from the right to be named as co-payee on the Claim, Mr. Dargahi was unable to demonstrate that any amounts were eligible for reimbursement beyond the expenses stated on the original claim form of $13,000, less a deductable of $10,000, an amount which was not disputed by either party.   If Kest incurred other eligible expenses before the sale to the Dargahis, no evidence of such was forthcoming.

10

After the sale, it is undisputed that the Dargahis, not Kest, would be the party who must front any expenses that might prove eligible for reimbursement from the Underground Storage Tank Cleanup Fund.  Mr. Dargahi did not adduce any evidence of his own expenses that might be reimbursable under the Claim, if he had been able to keep the Claim in good status.  He testified that he was not given any information from Mr. Meisel or Kest about any potential reimbursements under the Claim.  In addition, any expenses funded by Mr. Dargahi would not have any impact on the sale price he and his spouse agreed to pay for the Property.

Apparently, the Dargahis opened their own subsequent claim with the SWRCB based on a subsequent leak (Ex. E).  Given the information about the extent and position of the 1985 leak and the later leak, any contamination from the later episode would also clean up the contamination from the 1985 leak. The Dargahis testified that they spent about $25,000 getting themselves back in the SWRCB program but the only specific expense cited was an application fee of $5,000.

Based on the foregoing, Kest is liable to the Dargahis for no less than $5,000 to compensate for the application cost to put the Property back into the SWRCB program, plus $3,000 in actual expenses under the Claim which could qualify for reimbursment.

### Statute of Limitations or Laches No Bar

Although Kest raised a four year statute of limitations and laches as a bar to recovery by the Dargahis, the undisputed evidence is that the Dargahis first learned about Kest's final dismissal from the SWRCB program in the fall of 2002.  This case was filed in July 2003 and the complaint was filed in July 2006.  The doctrine of laches is also inappropriate to apply in this case.  The Dargahis made demands based on the Claim no later that January 2006.  The court rejects Kest's arguments on timeliness.

### Interest Charges on the Note

The dispute between the parties regarding interest accrual was resolved by concession by Kest in Kest's post-trial brief.  The Debtors had challenged the continuance of interest at 12% after October 2001 when the Note, as amended in 1999 called for the rate to return to the pre-amendment rate of 9%.  Although there were arguments about continued default, oral consent, implied consent, course of dealing, and waiver, Kest has concluded that it will not press for recognition of such consent in light of the fact that the Note requires all amendments to be in writing.  Exhibit TT shows Kest's mortgage amortization schedule at the 9%, plus default interest as provided in the Note.

11

<u>Kest's Claim for Attorneys Fees on Relief from Stay</u>

Kest relies on the following provision in the Note: *"Should the indebtedness represented by this note or any part thereof be collected at law or in equity, or in bankruptcy, receivership or any other court proceeding (whether at trial or at appellate level), or should this note be placed in the hands of attorneys for collection upon default, Payor agrees to pay, in addition to principal, interest or other sums due and payable hereon, all costs of collecting or attempting to collect this note, including reasonable attorneys' fees and expenses."*

The Debtors do not dispute that the Note provides for such fees and costs. However, the Debtors challenge Kest's inclusion of fees incurred in pursuit of relief from stay on which the Debtors prevailed. The court agrees with the Debtors.

When the bankruptcy court adjudicates a contract claim, the court applies state law unless the bankruptcy code provides otherwise. <u>In re Sparkman</u>, 703 F.2d 1097 (9th Cir. 1983). After the Supreme Court's decision in <u>Travelers Casualty & Surety Co. v. Pacific Gas</u>, 549 U.S. 443 (2007), it no longer matters whether the fees were incurred litigating bankruptcy issues or state issues so long as the contractual attorneys' fee clause is broad enough to cover both. In this case, the clause is broad enough.

The applicable state law is California Civil Code §1717 which provides, in relevant part: "*In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or note, shall be entitled to reasonable attorneys' fees in addition to other cost*s."

Kest argues that it is entitled to its fees and costs relating to the relief from stay matter because it is within the scope of the attorneys' fee clause and that the clause does not limit recovery to the prevailing party. This argument essentially reads CC §1717 out of existence.

At best, Kest's argument can be construed as saying that Kest is entitled to recover all of its fees even if the Debtors might also be entitled to recover their fees for the same action, presumably resulting in some kind of setoff. This construction is consistent with CC §1717(c).[2] At worst, Kest's argument can be

---

[2] CC §1717(c) provides: "*In an action which seeks relief in addition to that based on a contract, if the party prevailing on the contract has damages awarded against it on causes of action not on the contract, the amounts awarded to the party prevailing on the contract under this section shall be deducted from any damages awarded in favor of the party who did not prevail on the contract. If the amount awarded under this section exceeds the amount of damages awarded the party not prevailing on the contract, the net amount shall be awarded the party prevailing on the contract and judgment may be entered in favor of the party prevailing on the contract for that net amount.*"

12

construed as saying that Kest drafted the contract to make sure that the Debtors would have to pay for winning any disagreement with Kest, no matter how egregious Kest's positions might be, so long as Kest did not charge over-market rates or cheat on its accounting.

CC §1717(c) was designed to level the playing field somewhat.  Kest relies on its contract.  The Debtors should be able to rely on CC §1717(c).  The court finds that an award of fees to Kest on a matter on which it lost is not reasonable under the contract.

The evidence submitted by Kest in support of its request for fees and costs is contained in Exhibit SS.  The exhibit is a recitation of dates, billing party, invoice number, amount due, and running balance.  Some costs, as opposed to attorneys' fees, can be identified by the billing party.  Other out-of-pocket expenses may be included in the bills from the attorneys.  No detail is available on the attorneys' bills.

In the absence of detail, the fees and costs attributable to the relief from stay matter have been identified by the time period during which this matter was litigated and Kest's other activity in this bankruptcy case as revealed on the docket.  The relief from stay motion was filed by Kest on October 30, 2003.  It was submitted to the Bankruptcy Appellate Panel on December 15, 2005.  During that interval, the docket also reveals that Kest filed objections to the Debtors' plan and disclosure statement and filed another relief from stay which was denied by Judge Greenwald on the grounds that it affected the matters on appeal.

Beginning with the entry on 11/3/03 through the entry on 2/23/06 (the first entry after the appellate arguments), Kest incurred $65,641 in fees to Richard T. Baum.  Subtracting 10% for fees attributable to Kest's objections to the plan and disclosure statement, the result of $59,087 is a fair estimate of fees incurred by Kest in pursuit of the relief from stay matter.[3]

Based on the foregoing, Kest's claim in this case must be reduced by $59,087.

<u>Reduction for Amounts Paid Postpetition</u>

The parties agree that the Debtors are entitled to credit against the claim balance for the payments the Debtors have made since the commencement of the case.  Kest's schedule of the debt in Ex. TT appears to give credit for such payments through February 10, 2009.  The Debtors have not asserted otherwise.

---

[3] The Debtors suggest that Kest incurred *"$150,000 in connection with pursuit of a failed motion for relief from stay..."*  However, there is no reference to evidence which would alter the court's calculations set forth above.

13

The court agrees that credits for the period after February 10, 2009, can be calculated in connection with confirmation.

### Entitlement to Interest and Fees Post-Petition Based on Value of Collateral

The Debtors assert in their post-petition brief that Kest's claim cannot include any interest, fees and costs after the commencement of the case because Kest's claim is not fully secured by the value of the Property. Kest responds that the issue was not fairly raised in the litigation and, in any event, the Debtors must be bound to their previous assertions that Kest is oversecured by the value of the Property.

The court agrees with Kest that the value of the Property was <u>not</u> fairly raised as an issue in the litigation. Although the complaint seeks a determination under section 506(a) of the bankruptcy code, a comparison of debt to value was never brought up in the trial. Indeed, if the value of the Property is low enough to have eliminated some of the trial issues, then this matter might have been resolved with fewer days in court. The amount of Kest's claim at issue in the trial involved the elements cited and determined above, not the value of the collateral for the claim.

If the value of the Property is less than the amount of the claim determined herein, the Debtor's remedies in the bankruptcy court will be governed by the purpose for which valuation is needed. If, on the other hand, the case were to be dismissed, the challenge to Kest's claim based on the value of the collateral would be played out in the foreclosure process. In other words, determination of secured status may differ depending on timing and purpose.

The court specifically reserves jurisdiction to make determinations of value vis a vis the claim and whether Kest is oversecured or undersecured in the appropriate context next arising in this bankruptcy case.

### Status of the San Miguel Property or Personal Property as Security for Kest's Claim

The Debtors seek a determination in their post-trial brief that Kest does not have a security interest in the personal property related to the gas station or in the San Miguel residence property. Kest asserts that these matters were not part of the trial. Although neither San Miguel nor the personal property was raised in the complaint, San Miguel was the subject of considerable evidence elicited during the course of the trial.

San Miguel was offered as additional collateral when the Debtors purchased the Property in 1997. (Ex.1) The parties agreed that San Miguel would be reconveyed when new tanks were installed in accordance with all

14

application laws and regulations. At trial, Kest was uncertain whether it had recorded the trust deed on San Miguel or, if so, why it had not been reconveyed when new tanks were installed on the Property.

In considering the work done on the Property related to the environmental contamination and the undisputed fact that federal regulations required the Debtors to install new tanks in the late 1990s in order to remain in business, this court finds that the tanks were replaced in accordance with the then prevailing law. Kest testified that they presumed long ago that the tanks had been replaced for the same reasons.

The court finds that this matter was tried by consent of the parties and concludes that the San Miguel trust deed should be reconveyed forthwith.

The court finds that the extent of any lien on personal property was not the subject of trial.

### Plaintiffs' Objection to Defendants' Motion to Admit Defendants' Exhibits "C" Through "AA"

Plaintiffs have objected to the admission of Defendants' exhibits "C" through "AA". The court overrules Plaintiffs' objection.

### Conclusion

Based on the foregoing, the court comes to the following conclusions:

1. As of February 10, 2009, the amount of Kest's claim was $389,492.78,
   a. plus attorneys' fees and costs in the amount of $182,272;
   b. minus $300 as the statutory fee for failure to deliver a beneficiary's demand statement;
   c. minus $8,000 related to the SWRCB program;
   for a total claim of $563,464.78 as of February 10, 2009.
2. Kest is directed to record a reconveyance of the trust deed on San Miguel;
3. The status of Kest's claim as fully-secured or under-secured is specifically reserved for determination in connection with other relief sought in this case, as appropriate.
4. Unless the parties agree otherwise, Kest is directed to lodge a form of order consistent with this memorandum within 15 days of the entry hereof. The other party shall have 10 days thereafter to file an objection and alternative form of order. The form of the order may be decided without further hearing.

15

5. The Debtors are directed to obtain a hearing date for a status conference in the main case forthwith and to send notice thereof to Kest, the United States Trustee, and those creditors holding the largest unsecured claims.

###

DATED: November 17, 2009

*Kathleen Thompson*
United States Bankruptcy Judge

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled **MEMORANDUM OF DECISION ON TRIAL** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of 11/17/09, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

- Richard T Baum    rickbaum@hotmail.com, rickbaum@hotmail.com
- Cynthia Futter    cfutter@futterwells.com
- Anne Wells    wellsanne@earthlink.net
- Dennis Winters    winterslawfirm@cs.com

**II.  SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

Bailey Law Group, P.C.
Mohammed K Ghods
William A. Stahr
2100 N Broadway 3rd Flr
Santa Ana, CA 92706

Cynthia Futter
Anne E. Wells
Futter-Wells, P.C.
2463 Ashland Avenue
Santa Monica, CA 90405

Dennis S Winters
Winters Law Firm
1820 E 17th St
Santa Ana, CA 92705

**III.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below: